IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASTECH INTERNATIONAL, LLC, et al. | : | CIVIL ACTION |
| | : | NO. 07- 5241 |
| v. | : | |
| | : | |
| LAWRENCE A. HUSICK, ESQUIRE, et al. | : | |
| | : | |

O'NEILL, J.                                                          DECEMBER 18, 2009

<u>MEMORANDUM</u>

Plaintiffs ASTech International, LLC, Christopher Cashman, Robert Mullen, Ronald Cravens, Clair Gustafson, Kenneth Odde and Bruce Van Der Kamp filed a complaint against defendants Lawrence A. Husick, Robert S. Lipton, Laurence A. Weinberger and the law firm of Lipton, Weinberger & Husick, asserting six claims arising out of defendants' alleged legal malpractice. Presently before me are defendants' motion for summary judgment and plaintiffs' response thereto. For the following reasons, I will grant partial summary judgment in favor of defendants. The remainder of plaintiffs' claims will be held in abeyance until the United States Patent and Trademark Office issues a final decision on plaintiffs' on muzzle patent application.

BACKGROUND

Plaintiffs developed and owned two inventions relevant to this lawsuit. The first was a "method for positively identifying livestock and use thereof in legal instruments relating thereto" ("livestock identification invention"). U.S. Patent Provisional App. No. 60/351,128 (Jan. 23, 2002) (Pl.'s Exh. C).[1] This invention transcribed immutable characteristics of an animal–<u>i.e.</u>,

_____

[1]        There is considerable ambiguity with regard to the Patent Application Number for the livestock identification invention. Some of that ambiguity stems from the fact that the provisional patent application was later replaced with a non-provisional patent application. The non-provisional application number is 11/575,115. <u>See</u> United States Patent Application Publication No. US 2008/0215473 A1. That application, in its text, claims priority from provisional application number 60/562,131. Paragraph 19 of the amended complaint identifies

DNA, retinal blood vessel patterns or nose prints–into an "alphanumeric, human readable character string."  Id. at ¶¶ 0066-67.  The invention was designed to replace the more traumatic and invasive hot-iron branding identification system.  Id. at ¶ 0003.  The second was a "method and composition for delivery of medicants to animals" ("on muzzle invention").  U.S. Patent App. No. 10/084,592 (Feb. 25, 2002) (Am. Compl. ¶ 23).[2]  This invention placed "biological vaccines (antigens) or pharmaceuticals" directly onto the muzzle of an animal using "liquid or emulsion paint, spray, paste, mist, roll-on, or biofilm."  Specification of Claims at 7, U.S. Patent App. No. 10/084,592 (Def.'s Exh. L).  The animal would then instinctively clean its nose with its tongue, thereby depositing the medicant into the "nasal and/or oral mucosa."  Id. at 7.  This system was designed to replace needles as the method for delivery of vaccines which, in turn, "minimizes the need for human contact between the human operator and the animal" and reduces the tissue and hide damage associated with injections.  Id. at 3, 7.

On December 5, 2001, plaintiffs retained the law firm of Lipton, Weinberger & Husick to assist them in obtaining patents on both inventions.  Under the terms of the retention, the firm agreed to advise plaintiffs with respect to the acquisition, protection, licensing and exploitation

the provisional application number as 60/652,131.  Defendants' brief in support of its motion to dismiss uses the same number as the amended complaint.  However, plaintiffs' brief in opposition to the motion to dismiss uses 60/351,128.  Finally, correspondence from the USPTO contains the application number 60/351,120.

In a motion to file a second amended complaint filed on October 15, 2009, plaintiffs discuss the ambiguity and clarify that the actual provisional application number of the livestock identification patent application is 60/351,128.

[2]      This is the non-provisional patent application number found in the amended complaint, plaintiff's brief in opposition to the motion to dismiss and the USPTO file wrapper.  Defendant's brief in support of its motion to dismiss refers to number 01/084,592.  This discrepancy is likely due to a typographical error.

of the two inventions.  The firm assigned Husick to perform the work.  For the sake of clarity, I

will discuss separately the circumstances surrounding each of the patent applications.

I.       Livestock Identification Patent Application

On January 23, 2002, Husick filed a provisional U.S. Patent Application[3] for the livestock

identification invention.  Husick failed, however, to include the necessary $5.00 filing fee.  On

February 25, 2002, the USPTO mailed him a Notice of Missing Parts of Provisional Application

which instructed him to pay the filing fee.  Husick never paid the $5.00 filing fee. Consequently,

on July 9, 2003, the USPTO mailed him a notice of abandonment.  He never made any attempt to

revive that application because "[his] client had repeatedly failed to provide instructions to enter

the national stage despite repeated notices and [his] client never requested to revive the case or

attempt to revive it."  Husick Dep. 106:13-17 (Sep. 25, 2008).

During the time period between the retention of the law firm and the abandonment of the

livestock identification invention patent application Husick and plaintiffs exchanged several

---

[3]      A brief introduction to the classification of patents may be useful here.  There are
three general types of patents: (1) utility; (2) design; and (3) plant.  This lawsuit concerns utility
patents which are governed by 35 U.S.C. § 101.  Section 101 states: "[w]hoever invents or
discovers any new and useful process, machine, manufacture, or composition of matter, or any
new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and
requirements of this title."  Utility patents can further be classified as "provisional" or "non-
provisional."  A provisional patent application is an application that contains a specification and
drawings, but need not contain claims or an oath or declaration.  Peter S. Menell et al., Fed.
Judicial Ctr., Patent Case Management Judicial Guide § 11.2.2.2.4 (2009).  This type of
application is less expensive to prepare and serves the purpose of preserving a priority filing date
for a later filed non-provisional application.  Id.  A  non-provisional patent application is a
"regular" application.  It includes: "(1) a written specification, including one or more claims; (2)
an oath or declaration that the named inventor or inventors are believed to be the original and
first inventor or inventors of the claimed subject matter; (3) drawings as required to support the
application; and (4) applicable fees (e.g., filing fee, search fee, examination fee, and application
size fee)."  Id. at § 11.2.2.2.1 (citing 37 C.F.R. §§ 1.51; 111).

emails[4] and phone calls.  On October 18, 2002, plaintiff Van Der Kamp emailed Husick to inform him that "we believe that we are nearly at a point of converting this provisional patent to a utility status.  What are the necessary steps to do this?"  Husick responded several days later with the details of how to file a non-provisional application citing the provisional application as "priority matter."  He suggested that they "revise the application to include [their] present knowledge of the invention, and then file the case, either as just a US application, or under the Patent Cooperation Treaty[5] to protect the invention here or overseas."  On October 26, 2002, Van Der Kamp instructed Husick to file a U.S. application for a non-provisional patent.  On December 31, 2002, Van Der Kamp sent another email to Husick seeking confirmation that "a utility patent application has been filed."  Husick responded that he could not confirm the filing until his paralegal returned on January 2, 2003.  Husick never filed an non-provisional application for a utility patent on the livestock identification invention.  On January 23, 2003, Husick did, however, file an application for a patent under the Patent Cooperation Treaty but that application claimed priority for an incorrect provisional patent.

II.    On Muzzle Patent Application

On February 25, 2002, Husick filed a non-provisional U.S. patent application for the on muzzle invention.  Husick did not pay the filing fee and did not file the necessary declarations.  Consequently, on April 18, 2002 the USPTO sent a Notice of Missing Parts.  That Notice advised him that the application would be deemed abandoned if he did not correct the

---

[4]    All of the emails discussed herein are available in plaintiffs' exhibits E and F.

[5]    "Under the Patent Cooperation Treaty, applicants can file a single application in a qualified patent office to initiate prosecution in all signatory countries."  Patent Case Management Judicial Guide § 11.2.2.2.4.

deficiencies within two months.  Because Husick did not respond to the notice of missing parts, on November 26, 2003, the USPTO mailed him a Notice of Abandonment of the on muzzle patent application.  He has admitted to receiving the notice, but claims that he filed a petition requesting that the notice of abandonment be withdrawn.  The on muzzle application's file wrapper[6] includes no documentation of such a petition.

In 2003, plaintiff Cravens sent several emails to Husick inquiring into the status of the on muzzle patent application that had been filed on February 25, 2002.  On December 15, 2003, Husick responded via email:

> [a]fter you prompted me, I sent in a status request.  Last week, without explanation from the PTO, I got back a notice that the application had been abandoned!  Needless to say, I am hard at work tracking down the bonehead who made my request into an abandonment (no doubt, a wrong key pressed by a minimum wage worker) and will have the case back on track shortly.  (This is nothing to worry about, and will delay processing in the case only slightly, if at all).  I will keep you posted about your government in action!

In the notice of abandonment mailed to Husick on November 26, 2003, the USPTO stated the reason for abandonment was that no reply had been received.  USPTO, Notice of Abandonment [of livestock identification invention patent application] Under 37 CFR 1.53(f) or (g) (Nov. 26, 2003).

III.    Events Pertaining to Both Patent Applications

On April 15, 2004, Van Der Kamp sent another email to Husick inquiring into the status of both patents and expressing concern that it had been more than two years since the applications were filed and there had been no official word on any progress.  On May 11, 2004,

---

[6]    A file wrapper is "[t]he written record of the preliminary negotiations between an applicant and the Patent Office for a [patent]."  Black's Law Dictionary 628 (6th ed. 1990).

having received no response from Husick, Van Der Kamp re-sent the same email. This time, Husick responded: "[b]oth in queue at PTO, but given that the time to first official action is now sometimes >20 months, I am not concerned." In September 2004, plaintiffs again checked in with Husick regarding the status of their patent applications. They were told "[t]he PTO keeps slipping times to examine patents, so as they say in the government game, 'No News [sic] is just no news.' We will let you know the MOMENT anything does come our way."

On May 1, 2005, in preparation for an impending board meeting, Cravens again asked Husick via email for an update on the patents. In that email Cravens indicated that he had tried to check the status of the patents on the USPTO's website and had received a message stating: "[s]orry, the entered application number '10/084592' is not available. The number may have been incorrectly typed, or assigned to an application that is not yet available for public inspection." Having received no response, Cravens again emailed Husick to plead for information. Husick responded: "I will check with the PTO, but at this time, your application is just outside the average times now prevalent in the Patent Office . . . so you should not be worried."

On July 20, 2005, plaintiffs hired another lawyer, Lara S. Dickey,[7] to represent them with regard to their patent applications. The next day, Dickey wrote to Husick requesting that the files regarding the two patents be transferred to her firm. Dickey followed up with several phone calls until, on September 16, 2005, she received assurances from Judith King, Husick's administrative assistant, that the files would be transferred within several days. On September 20, 2005, Dickey

---

[7]     Dickey is referred to as "Lara Dickey Lewis" in the amended complaint and defendant's brief in support of its motion to dismiss. For the purposes of this Memorandum, I will refer to her by the name used in more recent submissions–"Lara S. Dickey."

received a letter from Husick's law firm stating that the entire file pertaining to the livestock identification invention had been destroyed pursuant to the client's instructions. The only document she received regarding the livestock identification invention was the PCT application filed by Husick on January 23, 2003. That letter made no reference to the on muzzle file. Between September 20, 2005 and October 24, 2005, Dickey sought further explanation from Husick and his firm for the missing documents. She received no response. On October 7, 2005, she filed new powers of attorney with the USPTO with regard to the on muzzle application. Upon receiving notice on October 24, 2005 that the USPTO had accepted her powers of attorney, she inquired into the status of the application and found that it had been abandoned as of June 19, 2002. At that time, it was not clear to Dickey whether a petition to revive the application had been filed. Between October 24, 2005 and November 3, 2005, Dickey continued to request information from Husick. During that time-frame, she spoke to King who told her that the on muzzle application did not exist. King allegedly did promise to look into the matter further and provide Dickey with a copy of the client's instructions to destroy the provisional application. Despite a letter and several phone calls directed to Husick between November 3, 2005 and April 25, 2006, Dickey received no further response. On January 6, 2006, she ordered a complete file wrapper of the on muzzle application. That file wrapper was not available electronically at the time. Upon receipt of the file wrapper, she discovered that no attempt had been made to revive either of the applications. Dickey claims that only after receiving the file wrapper did she suspect that Husick's mismanagement of the patent applications–and not some reasonable and innocent explanation–was the cause of the abandonment. She further alleges that Husick's unresponsiveness to her requests for the files was a deliberate attempt to conceal his actions.

On March 12, 2007, Dickey filed a petition with the USPTO to revive both patent applications for either unavoidable delay or unintentional delay.  USPTO, Decision on Petition for Revival Under 37 CFR 1.137(a) and 37 CFR 1.137(b) (Dec. 18, 2007).  With regard to the livestock identification application, the petition was dismissed without prejudice for failure to include appropriate documentation.  Id.  On February 18, 2008, Dickey renewed that petition and included the appropriate documentation.  On April 9, 2008, the renewed petition to revive for unintentional abandonment was granted.  USPTO, Decision on Petition for Revival Under 37 CFR 1.137(a) and 37 CFR 1.137(b) (Apr. 9, 2008).  Since the revival of the livestock identification patent application was granted, there have been several USPTO actions.  Most recently, on May 22, 2009, the USPTO issued a non-final rejection of that application on various grounds.

On May 9, 2008, the on muzzle application was revived on the grounds of unintentional abandonment.  That application has also been the subject of several USPTO actions including a final rejection, an amendment and response by Dickey and an advisory action by the USPTO rejecting the new and amended claims.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Summary judgment will be granted "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. Id. at 322-23. If the moving party sustains the burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. See Anderson, 477 U.S. at 255.

When a properly supported motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). However, the "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the moving party. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (internal citations and quotations omitted).

DISCUSSION

Defendants make four arguments in support of their motion for summary judgment: (1) with respect to Counts I, III, V and VI, plaintiffs' claims of negligence and misrepresentation are barred by the statute of limitations; (2) with respect to Counts V and VI, plaintiffs cannot establish that they suffered actual loss as a result of defendants' misrepresentations; (3) with respect to Counts I through IV, plaintiffs cannot establish that they suffered actual loss as a result

of defendants' alleged legal malpractice; and (4) with respect to all six counts, plaintiffs cannot

establish damages with a reasonable degree of certainty.

I.       Counts I, III, V and VI Are Partially Barred by the Statute of Limitations

         A.       Legal Standard

         Defendants argue that plaintiffs' negligence and misrepresentation claims, contained in

Counts I, III, V and VI, are barred by the statute of limitations.[8]  Pennsylvania law requires any

action based on "injury to the person or property which is founded on negligent, intentional, or

otherwise tortious conduct or any other action or proceeding sounding in trespass, including

deceit or fraud" to be brought within two years.  42 Pa. Cons. Stat. Ann. § 5524(7).

"Pennsylvania favors strict application of the statutes of limitation."  Glenbrook Leasing Co. v.

Beausang, 839 A.2d 437, 441 (Pa. Super. Ct. 2003).  "The occurrence rule is used to determine

when the statute of limitations begins to run in a legal malpractice action."  Wachovia Bank,

N.A. v. Ferretti, 935 A.2d 565, 572 (Pa. Super. Ct. 2007).  "Under the occurrence rule, the

statutory period commences upon the happening of the alleged breach of duty," not when the

plaintiff suffers actual loss.  Id. at 572-74 (citing Garcia v. Cmty. Legal Servs. Corp., 524 A.2d

980 (Pa. Super. Ct. 1987)).  However, Pennsylvania courts have applied the discovery rule to toll

the statute of limitations where, despite the exercise of due diligence, the plaintiff could not

reasonably have discovered her injury or its cause.  Id. (citing Pocono Int'l Raceway v. Pocono

Produce, Inc., 468 A.2d 468, 471 (Pa. 1983)).  Where the discovery rule is applied to legal

malpractice actions the two-year period begins to run where the plaintiff knew or in the exercise

---

[8]       Plaintiffs contract claims are subject to a four year statute of limitations.  42 Pa.
Cons. Stat. Ann. § 5525(a)(1).  Defendants do not argue that any claims are beyond the four year
statutory period.

of reasonable diligence should have known of the breach.  Id.

A similar exception applies where the relevant facts were fraudulently concealed from the plaintiff.  42 Pa. Cons. Stat. Ann. § 5504(b).  Like cases in which the discovery rule applies, fraudulent concealment operates to toll the statute of limitations "only until such time as the plaintiff discovers or reasonably should have discovered the fraud."  Hoppe v. SmithKline Beecham Corp., 437 F. Supp. 2d 331, 336 n.4 (E.D. Pa. 2006) (citing Urland v. Merrell-Dow Pharm., Inc., 822 F.2d 1268, 1272-74 (3d Cir. 1987)).

Reasonable diligence is an objective standard.  Kingston Coal Co. v. Felton Min. Co., Inc., 690 A.2d 284, 289 (Pa. Super. Ct. 1997).  "The question of due diligence in discovering an injury, as it relates to a statute of limitations defense, is usually one for a jury's consideration.  However, where the facts are so clear that reasonable minds cannot differ as to whether the plaintiff should reasonably be aware that he has suffered an injury, the determination as to when the limitations period commences may be made as a matter of law."  Id. at 288.  Pennsylvania courts have held that "where information is available, the failure of a plaintiff to make the proper inquiries is a failure to exercise reasonable diligence as a matter of law."  Id. at 289.

B.    Application

This lawsuit was filed on December 13, 2007.  Therefore, if plaintiffs knew or with the exercise of reasonable diligence should have known of their injury or its cause before December 13, 2005, their claims of negligence and misrepresentations by defendants are barred.  Plaintiffs argue that, in light of Husick's misrepresentations, the earliest they could have known that they had suffered an injury was January 2006 when Dickey ordered the file wrapper from the USPTO. Defendants argue that had plaintiffs exercised reasonable diligence they would have known of

their injury no later than October 2005 when they revoked Husick's power of attorney in favor of

Dickey.  They note that after Dickey received plaintiffs' power of attorney she had full access to

information regarding the status of both patent applications and the fact that she did not request

that information until January 2006 constitutes a lack of due diligence.

I agree with defendants.  It is apparent from the record that as early as April 15, 2004,

plaintiffs suspected that their patents may not have been "in the queue" at the USPTO.  Email

from Van Der Kamp to Husick (Apr. 15, 2004, 8:07 AM).  Based on the information available to

them at the time, plaintiffs' concerns were well founded.  Around February 3, 2003, plaintiffs

signed some herein-unidentified papers regarding the livestock identification patent.  Shortly

thereafter, plaintiff Ron Cravens emailed Husick asking for an update on the progress of the on

muzzle patent application and expressing concern that the partners were never asked to sign

anything in connection with that application.  Email from Cravens to Husick (Feb. 3, 2003, 7:37

PM).  Cravens did not receive a response until December 15, 2003, when Husick informed him

that the on muzzle application had been abandoned but that he would have "the case back on

track shortly."  Email from Husick to Cravens (Dec. 15, 2003, 2:24 PM).  In light of this

information, plaintiffs' concerns should have been further aroused on May 1, 2005 when Cravens

attempted to check electronically the status of the on muzzle patent and received a message that

stated: "the entered Application Number '10/084592' is not available."  Email from Cravens to

Husick (May 1, 2005, 9:59 AM).  Indeed, plaintiffs were concerned enough with the status of

their patent applications that in July 2005 they terminated their relationship with Husick and

retained Dickey to represent them.

Pennsylvania courts have held that "[i]f a party has the means of discovery [of his injury

12

and its cause] within his power but neglects to use them, his claim will still be barred."

Baumgart v. Keene Bldg. Prods. Corp., 633 A.2d 1189, 1193 (Pa. Super. Ct. 1993) (quoting

Burnside v. Abbot Labs., 505 A.2d 973, 988 (Pa. Super. Ct. 1985)).  Plaintiffs admit that the

information necessary to determine that Husick had acted negligently and made

misrepresentations was contained, among other places, in the file wrapper.  Pl.'s Br. at 46 ("[o]n

January 6, 2006, Ms. Dickey ordered a copy of the complete file wrapper of the on muzzle

application, and only then discovered that no attempts at reviving had been made.").  Dickey had

the ability to obtain that file wrapper no later than October 24, 2005, when she received

plaintiffs' power of attorney.  In fact, on the day she received the power of attorney, Dickey did

indeed call the USPTO to inquire into the status of the patents and was informed that at least one

of the patents had been abandoned.

Both the discovery rule and the fraud exception only toll the statute of limitations until

such time as plaintiffs knew or reasonably should have known of the injury or its cause.  Fine v.

Checcio, 870 A.2d 850, 861 (Pa. 2005).  Here, plaintiffs should have known of their injury and

its cause no later than October 2005.  I find that there is no genuine issue of material fact as to

that matter.  See id. at 862-63 (noting that the proper question on summary judgment is "whether

there are genuine issues of material fact as to whether [the plaintiff] knew or was unable to know,

despite the exercise of reasonable diligence, that she was injured and by what cause at the time

the injury was inflicted.").  Accordingly, all tort claims[9] contained in Counts I, III, V and VI

_____

[9]      I note that plaintiffs' tort and contract claims arise out of exactly the same
conduct.  Although not raised by either party, there is a concern, expressed by then-Chief Judge
Fullam that "if allegations of a contractual relationship between plaintiff and defendants, and of
an express or implied term of the contract establishing an obligation to exercise reasonable care,
were to suffice to state a breach-of-contract malpractice case, 'the two year limitations statute for

arising out of actions that occurred before December 13, 2005 are barred.[10]

II.    Plaintiffs Have Presented Sufficient Evidence to Support a Finding that they Have
       Suffered Harm as a Result of Defendants' Alleged Misrepresentations

       Defendants next argue that plaintiffs are unable to bear their burden of proving that they

---

tort actions would be a dead letter in ... malpractice cases.'" See Sherman Indus., Inc. v.
Goldhammer, 683 F. Supp. 502, 506 (E.D. Pa. 1988) (quoting Stetson v. Carty, No. 83-6071
(E.D. Pa. Jul. 18, 1984)).  In recognition of this concern, judges both on this Court and on the
Pennsylvania Superior Court have required plaintiffs pursuing a breach of contract malpractice
claim to demonstrate that the attorney failed to follow a specific instruction of the client.  See,
e.g., id.; Rogers v. Williams, 616 A.2d 1031 (Pa. Super. Ct. 1992); Hoyer v. Frazee, 470 A.2d
990 (Pa. Super. Ct. 1984); Duke & Co. v. Anderson, 418 A.2d 613 (Pa. Super. Ct. 1980).  In
2002, however, the Superior Court overruled those precedents in light of an intervening
Pennsylvania Supreme Court decision.  See Gorski v. Smith, 812 A.2d 683, 693-95 (Pa. Super.
Ct. 2002) (discussing the effect of Bailey v. Tucker, 621 A.2d 108 (Pa. 1993)).  There the court
noted:

> Bailey established the proposition that every contract for legal
> services contains, as an implied term of the contract, a promise by the
> attorney to render legal services in accordance with the profession at
> large. Thus, when an attorney enters into a contract to provide legal
> services, there automatically arises a contractual duty on the part of
> the attorney to render those legal services in a manner that comports
> with the profession at large. Hence, a breach of contract claim may
> properly be premised on an attorney's failure to fulfill his or her
> contractual duty to provide the agreed upon legal services in a manner
> consistent with the profession at large.

On questions of state law, I must predict how the Pennsylvania Supreme Court would rule
on the issue.  Jewelcor, Inc. v. Karfunkel, 517 F.3d 672, 676 n.4 (3d Cir. 2008).  In making that
determination, "decisions of state intermediate appellate courts should be accorded significant
weight in the absence of an indication that the highest state court would rule otherwise."  Id.
Despite concerns about the application of a four year statute of limitations to what essentially
amounts to an ordinary tort claim, there is no indication that the Pennsylvania Supreme Court
would rule differently on the issue than did the Gorski Court.  Accordingly, plaintiffs'
malpractice claims sounding in breach of contract will not be dismissed as untimely.

---

     [10]     Plaintiffs allege that between December 13, 2005 and April 25, 2006, Dickey
continued to request that defendants transmit to her any information in their possession
pertaining to the two patents.  She received no response.  These failures to respond appear to be
the only actions by defendants that occurred within two years of the date on which suit was filed.
Accordingly, only those tort claims arising out of those failures to respond are timely.

suffered harm as a result of defendants' misrepresentations. Def.'s Br. at 13. In order to make out a claim for intentional misrepresentation plaintiffs must show: "(1) a representation; (2) material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Hanover Ins. Co. v. Ryan, 619 F. Supp. 2d 127, 141 (E.D. Pa. 1997) (citing Heritage Surveyors & Eng'rs, Inc. v. Nat'l Penn Bank, 801 A.2d 1248, 1250-51 (Pa.2002)). "The elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." DTK Ventures, L.P. v. Russo, No. 05 EQ 4059, 2006 WL 2988463, at *6 (Pa. Com. Pl. Aug. 21, 2006) (internal quotation marks omitted).

Most of the alleged misrepresentations are barred by the statute of limitations; the only remaining actionable misrepresentations are those that occurred between December 13, 2005 and April 25, 2006. Plaintiffs allege that during that time period Dickey continued to request that defendants transmit to her any information in their possession pertaining to the two patent applications but that she received no response. Pennsylvania courts have held that "[a] misrepresentation need not be an actual statement; it can be manifest in the form of silence or failure to disclose relevant information when good faith requires disclosure." County of Lackawanna v. Verrastro, No. 08 CV 887, 2009 WL 3825873, at *47 (Pa. Com. Pl. June 4, 2009). Plaintiffs argue that defendants' failure to respond to Dickey's requests delayed their discovery of the fact that the patent applications had been abandoned. This, in turn, may have

caused them to incur additional legal fees and costs and to shorten the valuable patent life of their inventions. Am. Compl. ¶ 34. They have presented evidence sufficient to raise a genuine issue of material fact with regard to the harm resulting from these alleged misrepresentations. Accordingly, I will deny defendants' motion for summary judgment on counts V and VI.

III.    Actual Loss Analysis

Pennsylvania courts have held that legal malpractice actions sound both in tort and in contract. Wachovia Bank, 935 A.2d at 570. A plaintiff may properly bring both claims at the same time. Gorski, 812 A.2d at 693-94. To state a legal malpractice claim under a negligence theory, the plaintiff bears the burden of proving: "(1) employment of the attorney or other basis for a duty; (2) failure of the attorney to exercise ordinary skill and knowledge; and (3) that such failure was the proximate cause of the harm to the plaintiff." Id. at 570-71 (citing Bailey, 621 A.2d at 112. Where a plaintiff pursues a legal malpractice claim under a breach of contract theory, the plaintiff bears the burden of proving: "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages." CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). An essential element of a claim pursued under either theory is "proof of actual loss rather than a breach of a professional duty causing only nominal damages, speculative harm or the threat of future harm." Kituskie v. Corbman, 714 A.2d 1027, 1030 (Pa. 1998); Duke & Co. v. Anderson, 418 A.2d 613, 617 (Pa. Super. Ct. 1980) ("[w]e therefore conclude that when it is alleged that an attorney has breached his professional obligations to his client, an essential element of the cause of action, whether the action be denominated in assumpsit or trespass, is proof of actual loss."). As with all essential elements of a claim, the plaintiff bears the burden of proving actual loss. Id.

A.      Appropriate Standard for Proving Actual Loss

Defendants argue that plaintiffs are unable to prove actual loss and therefore summary judgment should be entered in defendants' favor.  In order to prove actual loss, the plaintiff in a legal malpractice action must prove that the underlying representation would have been successful.  The courts have often referred to this methodology as "a case-within-a-case." Kituskie, 714 A.2d at 1030.  Plaintiffs make two objections to the application of the case-within-a-case methodology to the present case.

First, they suggest that any reference to the case-within-a-case methodology by the Pennsylvania Supreme Court is dicta and therefore does not bind this Court.  I disagree.  The Kituskie Court held "[i]n essence, a legal malpractice action in Pennsylvania requires the plaintiff to prove that he had a viable cause of action against the party he wished to sue in the underlying case and that the attorney he hired was negligent in prosecuting or defending that underlying case (often referred to as proving a "case within a case")."  Id.  In addition, the case law in this area is replete with trial court, intermediate appellate court, and Supreme Court decisions referring to or applying the case-within-a-case methodology.  See, e.g., Poole v. W.C.A.B. (Warehouse Club), 810 A.2d 1182, 1184 (Pa. 2002) (citing Kituskie, 714 A.2d at 1030); Myers v. Robert Lewis Seigle, P.C., 751 A.2d 1182, 1184 (Pa. Super. Ct. 2000) (same); Parkinson v. Kitteridge, Donley, Fullem & Embrick, L.L.P, No. 0506, 2006 WL 2008922, at *2 n.2 (Pa. Com. Pl. July 10, 2006) (same).  Accordingly, I have no difficulty concluding that the case-within-a-case method of proof is currently applied by the Pennsylvania courts in legal

malpractice actions sounding in tort and breach of contract.[11]

Second, plaintiffs argue that the case-within-a-case methodology, and therefore the requirement that a plaintiff prove actual loss, only applies to cases arising out of attorney malpractice in the course of litigation. Therefore, in their view, it does not apply in this case because the underlying representation pertained to a transactional matter. Mindful of the overarching requirement that all legal malpractice plaintiffs prove actual loss, I disagree with this contention as well. Plaintiffs cite a series of cases in support of their proposition. The first, McGrorey v. Obermayer, Rebmann, Maxwell & Hippel, 14 Pa. D. & C. 3d 335, 352 (Pa. Com. Pl. 1978), is inapposite. There, the alleged malpractice occurred when the defendant failed to bring a valid claim on behalf of the plaintiff. That alleged malpractice occurred in the course of litigation and the court applied the case-within-a-case methodology. McGrorey, 14 Pa. D & C. at 352. Thus, McGrorey does not support plaintiffs' proposition. Id. (finding the trial court's jury instruction incorporating the case-within-a-case methodology to be an accurate statement of the

---

[11]     I also disagree with plaintiff's suggestion that section 323(a) of the Restatement (Second) of Torts should be applied in this case. That section states:

> [o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

The Pennsylvania Superior Court, relying on a decision by this Court, has unequivocally rejected the application of this "risk of harm" analysis to legal malpractice claims. Myers, 751 A.2d at 1185 (citing Gans v. Gray, 612 F. Supp. 608, 614 (E.D. Pa. 1985)) ("[w]e agree with [the Gans Court's] interpretation of our law and, thus, will not apply an increased risk of harm standard to legal malpractice actions."). I agree with the reasoning of both Myers and Gans and will adopt their conclusions here.

law).  The other cases cited by plaintiffs, <u>Air Measurement Techs., Inc. v. Akin Gump Strauss</u>

<u>Hauer & Feld, L.L.P.</u>, 504 F.3d 1262, 1268-69 (Fed. Cir. 2007) and <u>Hackers, Inc. v. Palmer</u>, No.

10361, 2006 WL 4091390 (Pa. Com. Pl. Apr. 6, 2006), also do not support the contention that

proof of actual loss is not necessary in malpractice actions outside the context of litigation.

Instead, both of those cases have merely  recognized that the "case-within-a-case" terminology

(as opposed to methodology) is inappropriate where the alleged malpractice arises outside the

context of litigation because, in such cases, there is technically no "case" to be proven.

Regardless of whether the method of proof is characterized as "case-within-a-case," "transaction-

within-a-case" or "patent-prosecution-within-a-case," Pennsylvania courts have been very clear

that plaintiffs in all malpractice actions must prove actual loss.  To do so, they must prove that

the underlying legal representation would have achieved whatever the plaintiffs hoped to achieve.

If the underlying case, transaction or patent prosecution would have failed regardless of the

defendant's professional negligence, then the plaintiffs have not suffered actual loss.  As the

<u>Hackers, Inc.</u> Court stated:

> in a matter involving litigation, a plaintiff must prove that, but for his
> attorney's negligence, a different result would have occurred in the
> litigation.  In a transactional legal matter, the proximate cause prong
> can be satisfied by showing that, but for this breach of professional
> duty, client would not have suffered an actual loss.

<u>Hackers, Inc.</u>, 2006 WL 4091390, at *490.

Plaintiffs also cite a series of cases discussing the doctrines of concurrent negligence and

intervening cause.  <u>E.g.</u>, <u>Kituskie</u>, 714 A.2d at 1031-32; <u>Majors v. Brodhead Hotel</u>, 205 A.2d

873, 878 (Pa. 1965) (addressing whether the defendant's decision to serve an already-drunk

patron was a "substantial factor" in causing the plaintiff's injury); <u>Carlson v. A&P Corrugated</u>

19

Box Corp., 72 A.2d 290, 293 (Pa. 1950) (holding that a negligent defendant bears the burden of showing an "act of God" would have caused the injury independently of his negligence); Yenchko v. Grontkowski, 122 A.2d 705, 706 (Pa. 1956) (same); Livingston v. Cox, 6 Pa. 360, 1847 WL 4906, at *3 (1847); Kravinsky v. Glover, 396 A.2d 1349, 1356 n.10 (Pa. Super. Ct. 1979) (stating the general rule of concurrent negligence). Only two of those cases, Kituskie and Livingston, concern legal malpractice actions. In both cases, the Pennsylvania Supreme Court recognized that the plaintiff bears the burden of proving actual loss. Kituskie, 714 A.2d at 1030 ("[a]n essential element to [a legal malpratice] cause of action is proof of actual loss rather than a breach of a professional duty causing only nominal damages, speculative harm or the threat of future harm."); Livingston, 1847 WL 4906, at *3 ("[i]t is certainly true, that the measure of damages, in a case like the present, is the actual loss sustained by the negligence of the attorney."). In Kituskie, the court went on to hold that the collectibility of damages should be considered in a legal malpractice action and that the defendant bears the burden of proving by a preponderance of the evidence the affirmative defense that the underlying case was not collectible. Kituskie, 714 A.2d at 1032. Plaintiffs interpret this holding to mean that "it imposes an unfair burden upon the client to place the burden upon the client to prove that no other cause would have intervened between the attorney's negligence and the conclusion of the transaction to prevent its successful conclusion." Pl.'s Br. at 17. However, plaintiffs overlook the important fact that in Kituskie, the plaintiffs had already proven actual loss. Kituskie, 714 A.2d at 1032 ("[f]ollowing a trial on the matter . . . a jury found that [the defendants] were liable to [the plaintiff] for legal malpractice in the amount of $2,300,000."). That case merely stands for the unexceptional  principle that after the plaintiff has proven the elements of its claim the defendant

can prevail by proving an affirmative defense.

Plaintiffs also quote the following passage from <u>Livingston</u>:

> though this might have been possible, or even probable in this particular case, it may still with truth be affirmed that the client <u>lost the opportunity</u> of securing the amount due to him because of the default of the first attorney, and has, therefore, suffered an injury at his hands, commensurate with the debt due, should the money eventually remain uncollected. That another was also negligent cannot excuse the first neglect: especially if the latter be a volunteer, and <u>it be at all doubtful under the facts in proof whether the exercise of due diligence would have secured payment</u>. . . . [t]he onus of showing this lies upon him who seeks to escape the consequences of prior laches, and he ought to show it clearly.

Pl.'s Br. at 18 (citing <u>Livingston</u>, 1847 WL 4906, at *3) (emphases added by plaintiffs). Despite plaintiffs' added emphases, the critical phrase here is "should the money eventually remain uncollected." With that phrase, the court recognized that if the money were ultimately collected, there would be no actual loss and therefore no actionable legal malpractice. In that event, there would be merely a breach of professional duty with no resulting harm which, per <u>Kituskie</u>, cannot support a legal malpractice claim. <u>Kituskie</u>, 714 A.2d at 1030. The remainder of the <u>Livingston</u> Court's analysis presumed the existence of actual loss and addressed the burdens of proof applicable where more than one actor's negligence caused the actual loss. Such a discussion in not applicable here.[12]

One of the important policies underlying the requirement of proving actual loss–and, in turn, the case-within-a-case methodology–is to prevent the plaintiff from obtaining a windfall judgment. If plaintiffs' inventions in this case were not patentable in the first place, then even

---

[12] To the extent that plaintiffs argue that a "loss of opportunity" analysis should apply in the legal malpractice context, I have rejected that contention <u>supra</u> in footnote 11.

with the best imaginable representation the patent applications would have failed.  To allow

plaintiffs to recover damages without first requiring proof that the inventions were patentable

would "[allow them] to wrest from [their] former counsel something that, thus far, has eluded

[them] in the marketplace-a monetary return from [their inventions]."  Ingen, Inc. v. White, 672

N.Y.S.2d 867, 868 (N.Y. App. Div. 1998).

In light of the foregoing, I hold that in order for plaintiffs to carry their burden of showing

actual loss they must prove either that their inventions are presently patentable or that their

inventions were patentable under the pre-KSR[13] obviousness standard.[14]  This requirement may

be obviated somewhat by my decision, discussed more fully infra, to hold the case in abeyance

pending the outcome of the USPTO proceedings.

B.     Plaintiffs Have Presented Sufficient Evidence To Support a Finding of Actual
       Loss

Plaintiffs have alleged that they were injured in several ways.  See Am. Compl. ¶ 34.

First, they argue that they suffered injury when they paid legal fees to defendants in exchange for

work of no value and then had to pay Dickey to revive the applications.[15]  Second, operating

---

[13]     KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398 (2007), "dramatically changed the
calculus for determining whether an invention was 'obvious.'" Robert Greene Sterne et al.,
Reexamination Practice with Concurrent District Court or USITC Patent Litigation, 982 Prac. L.
Inst. 603, 606 (2009); Daralyn J. Durie & Mark A. Lemley, A Realistic Approach to the
Obviousness of Inventions, 50 Wm. & Mary L. Rev. 989, 992-1000 (2008) (discussing the effect
of KSR on obviousness determinations and patentability).  Plaintiffs have presented expert
reports stating that under the post-KSR analysis it is more difficult and more expensive to obtain
a patent.

[14]     Plaintiffs' theories of actual loss are discussed more fully infra.

[15]     Plaintiffs also argue that defendants' malpractice caused "the failure of patents to
issue for the inventions" and that defendants' misrepresentations caused plaintiffs to be "denied
the opportunity to make prompt efforts to reinstate the patent applications and lost all opportunity

under the assumption that their patent applications will be granted by the USPTO, they argue that they have lost valuable patent life as a result of defendants' legal malpractice.  Finally, operating under the assumption that their patent applications will not be granted by the USPTO, they argue that due to defendants' negligence they lost the opportunity to have their patents considered under the more lenient pre-KSR standard.

1.     Plaintiffs Have Presented Sufficient Evidence to Raise a Genuine Issue of Material Fact as to Whether Defendants' Legal Malpractice Caused Plaintiffs the Actual Loss of Hiring Other Counsel

With regard to the first alleged injury, plaintiffs have provided sufficient evidence to raise a genuine issue of material fact.  There appears to be no argument to the contrary.  The evidence suggests that plaintiffs instructed defendants to take certain actions on their behalf.  The evidence further suggests that defendants failed to follow those instructions.  When plaintiffs were forced to hire another attorney to revive the patent applications and redo much of the work that should have been done by defendants, they suffered actual loss in the amount of the additional legal fees.  To the extent that defendants contest this evidence, such factual determinations will, of course, be made by a jury.

2.     Plaintiffs Have Presented Sufficient Evidence to Raise a Genuine Issue of Material Fact as to Whether Defendants' Legal Malpractice Caused Plaintiffs Loss of Valuable Patent Life or the Opportunity to Have Their Applications Considered Under the Less Stringent Pre-KSR Obviousness Standard

With regard to the second and third injuries alleged by plaintiffs, defendants first argue

---

to reinstate those patent applications because the efforts to do so were not timely."  See Am. Compl. ¶¶ 34, 56, 60.  It is presently undisputed that both patent applications were revived and reinstated.  Accordingly, defendants' malpractice could not  have caused plaintiffs' patents not to issue.

that plaintiffs are unable to present evidence of actual loss because both patent applications have been revived and subsequently rejected.  Def.'s Br. 11-12.  They argue that the USPTO's rejections show that the inventions were unpatentable even with the best representation and that, therefore, plaintiffs have suffered no actual loss as a proximate cause of defendants' alleged malpractice.  Plaintiffs have presented expert reports indicating that the USPTO rejections are a normal part of the process and that even ultimately successful patent applications experience an average of between two and four rejections before a patent issues.  They argue that even the "final rejection" issued with regard to the on muzzle application is not unequivocally final.  Additionally, plaintiffs have presented evidence that indicates they will suffer loss even if the applications are unequivocally rejected by the USPTO.  Accordingly, I find that there is a genuine issue of material fact as to whether plaintiffs have suffered actual loss.

The fact that the precise nature of the damages is uncertain at this stage does not require a grant of judgment in favor of defendants.  In Pashak v. Barish, 450 A.2d 67, 68 (Pa. Super. Ct. 1982), the Superior Court held that "damages are speculative only if the uncertainty concerns the fact of damages rather than the amount."  Here, plaintiffs have provided sufficient evidence to raise a genuine issue of material fact as to their allegations that they will suffer injury whether the USPTO grants or denies their patent applications.  They argue that if the patent applications are granted by the USPTO plaintiffs will have lost valuable patent life as a result of defendants' malpractice.  If, on the other hand, the patent applications are denied, plaintiffs will have lost the opportunity to have their applications considered under the more lenient pre-KSR standard.  Therefore, the allegation that plaintiffs have suffered injury is supported by the evidence even if the precise nature of the damages is unclear.  Accordingly, I will deny defendants motion for

summary judgment on this point.

IV.     Plaintiffs Proposed Damages Are Partially Speculative

In addition to arguing that plaintiffs cannot prove actual loss, defendants also argue that plaintiffs alleged damages are too speculative to permit recovery.  Def.'s Br. at 14-16.  In Pennsylvania, "the determination of damages is a factual question to be determined by the [jury]."  Delahanty v. First Pennsylvania Bank, N.A., 464 A.2d 1243, 1257 (Pa. Super. Ct. 1983).  The plaintiff bears the burden of presenting "sufficient evidence by which damages can be determined on some rational basis and other than by pure speculation and conjecture."  Curran v. Stradley, Ronan, Stevens & Young, 521 A.2d 451, 455 (Pa. Super. Ct. 1987).

A.      Legal Fees

With regard to plaintiffs' allegations that defendants' malpractice caused them to incur additional legal fees in prosecuting their patents, I find that plaintiffs have presented sufficient evidence upon which damages can be calculated on some rational basis.  The amount of $6,393.50 appears to be supported by some evidence.  Accordingly, I will deny defendants' motion for summary judgment as to this alleged injury.

B.      The On Muzzle Invention

Likewise, I find that plaintiffs have submitted evidence upon which a reasonable jury could determine the damages incurred by plaintiffs with regard to defendants' professional negligence in prosecuting the patent application for the on muzzle invention.  Defendants concede that plaintiffs have submitted an expert report on the damages incurred by the delay in issuance of the on muzzle patent.  Expert Report of Christopher M. Cashman (Def's. Exh. R).  However, they argue that there is no evidence of a potential buyer of that patent and therefore the

sale price and the resulting calculations of royalty income are based on speculation. Plaintiffs respond that they have not yet attempted to market this invention because they believe the invention will be most valuable after it is patented. Therefore, the current absence of a potential buyer does not mean the invention is altogether unmarketable. Instead, per plaintiffs, the fair market value of such a patent is contained in the Cashman report which marshals the considerable experience of Cashman in the pharmaceutical field to provide a list of potential buyers, a list of comparable transactions and projections of sale price and royalty income. I agree with plaintiffs. Defendants may, of course, contest the findings or qualifications of Cashman at trial.

C.    The Livestock Identification Invention

On the other hand, I find that plaintiffs have submitted no evidence upon which a reasonable jury could determine the damages incurred by plaintiffs with regard to defendants' professional negligence in prosecuting the patent application for the livestock identification invention. Indeed, in a prior motion submitted to this Court, plaintiffs admitted that "it would be very difficult to determine how much damage was caused to them by the delay arising from Defendants' conduct." Pl.'s Mot. to Dismiss Voluntarily Counts I, II, and V of the Amended Complaint ¶ 8 (Jun. 26, 2009) (Doc. 19). Having apparently abandoned that concession, in their present brief plaintiffs cite five exhibits in support of their contention that "[p]laintiffs, collectively, based upon their broad experience with comparable situations in their own careers and in the animal industry made reasoned and conservative estimates of the values of the patents." Pl.'s Br. at 42 (citing Cashman Report; Cravens Deposition; Van Der Kamp Deposition; Van Der Kamp Expert Report; Mullen Expert Report). Review of each of the

exhibits reveals no support for the valuation of the livestock identification invention. The amount of $191,000 appears not to have any connection to the evidence. Therefore, plaintiffs will be unable to provide a reasonable basis for the jury to calculate loss. Judgment must therefore be entered in favor of defendants on plaintiffs' claims of professional negligence arising in connection with defendants' allegedly unprofessional prosecution of the livestock identification patent.

       D.      The Most Efficient Course of Action Is To Hold this Lawsuit in Abeyance Pending Final Disposition by the USPTO.

Underlying defendants' arguments pertaining to the speculative nature of plaintiffs' actual loss and resulting damages is the fact that the USPTO has not issued a final decision on plaintiffs' on muzzle patent application. However, as discussed <u>supra</u>, this lack of an unequivocal decision affects only the precise nature, not the fact, of the actual loss. If the patent application is granted by the USPTO, plaintiffs will have lost valuable patent life as a result of defendants' malpractice. If, on the other hand, the patent application is denied, plaintiffs will have lost the opportunity to have their application considered under the more lenient pre-<u>KSR</u> standard.[16] At this stage, however, we do not have the benefit of a final USPTO ruling on the patent application. The most efficient course of action under these circumstances is to hold the case in abeyance

---

[16]     I express no opinion here as to whether any of plaintiffs' allegations of legal malpractice will be successful. That will, of course, ultimately be a question for the jury.

I note, however, that <u>KSR</u> changed only the standard by which non-obviousness is judged. <u>See</u> <u>KSR</u>, 550 U.S. 416-22 (discussing non-obviousness). Thus, I assume here without deciding that if plaintiffs' patent application were denied by the USPTO on grounds other than non-obviousness plaintiffs would not have benefitted from review under the more lenient pre-<u>KSR</u> standard. Accordingly, they would be unable to show actual loss under either theory. In that event, it appears likely that most of plaintiffs' claims could properly be disposed of by summary judgment. However, plaintiffs' claims that they have incurred additional legal fees as a result of defendants' misconduct would be unaffected by the USPTO's decision.

until the USPTO issues its decision.  That way, the jury will not need to untangle the complicated issue of patentability; instead, it will have the benefit of a decision by the specialized and highly skilled agency designed for that purpose.

In deciding to hold this case in abeyance I am mindful that were I to dismiss the case, even without prejudice, the statute of limitations would operate to bar most of plaintiffs' claims. As discussed supra, the statutory time period commences when a plaintiff knew or should have known of defendants' breach.  The application of this rule occasionally places potential plaintiffs in a dilemma because knowledge of a breach can occur years before the resulting actual loss is felt by the plaintiff.  A plaintiff in that situation must choose between filing her malpractice claim within the statute of limitations or waiting to file until actual loss can be proven.  If she files her claim in a timely fashion, but before actual loss has occurred, she runs the risk of dismissal.  If, on the other hand, she waits until actual loss can be proven, her claim may be forever barred by the statute of limitations.  One way to avoid forcing potential plaintiffs to make this Hobson's choice would be to apply the discovery rule to toll the statutory period until the plaintiff knows of both her injury and its cause.  In recognition of the competing concerns of finality, however, Pennsylvania courts presently apply the discovery rule only until the plaintiff knows of her injury or its cause.  See, e.g., Wachovia, 935 A.2d at 572.

Another way to avoid this problem, and one that is presently available here, is for the court to stay a malpractice claim that is timely filed but where the plaintiff has not yet suffered actual loss.  At least one Judge on this Court has interpreted the Pennsylvania Supreme Court's decision in Bailey, to anticipate just such a result.  Spillman v. Wallen, No. 95-750, 1996 WL 379553, at *8 (June 28, 1996) (Van Artsdalen, J.).  Judge Van Artsdalen rightly pointed out that

under this course of action "the aggrieved client's rights are protected while the purpose of the statute of limitations–to bar stale claims, avoid problems of proof arising from stale memories, and provide some measure of security against claims arising out of events long ago transpired–is fulfilled." Id. I agree with this reasoning. In this case, where there is sufficient evidence to support the proposition that plaintiffs have suffered actual loss but the precise nature of the loss remains unclear, I will hold the action in abeyance until the USPTO, by issuing a patent or an unequivocal rejection of the on muzzle application, clarifies the factual underpinnings of the case.

CONCLUSION

In sum, I will grant defendants' motion for summary judgment in the following respects: (1) with regard to all professional negligence and misrepresentation claims arising out of actions that occurred before December 15, 2005; and (2) with regard to all claims arising out of the allegedly unprofessional prosecution of the livestock identification invention patent application. In all other respects, defendants' motion will be denied and the case will be held in abeyance until the USPTO issues a final decision on plaintiffs' patent applications.

An appropriate Order follows.